**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLORADO**

In re:

700 17TH STREET, LLC,

Debtor.

Case No. 25-16173 KHT
Chapter 11

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

THIS MATTER came before the Court on (1) the *Debtor's First Amended Plan of Reorganization* (docket #120), filed by 700 17th Street, LLC ("Debtor"), and the Objection thereto (docket #159), filed by Wilmington Trust National Association, as Trustee for the registered holders of JPMCC Mortgage Securities Trust 2016-JP2, Commercial Mortgage Pass-Through Certificates, Series 2016-JP2 ("Lender"); and (2) the *Motion for Relief from the Automatic Stay or, in the Alternative, for Dismissal of the Debtor's Bankruptcy Case* (docket ##89, 132), filed by Lender, and the Objection thereto (docket ##108, 138), filed by Debtor. After an evidentiary hearing, the Court took the matter under advisement. The Court is now prepared to rule and hereby finds and concludes as follows:

### I.      JURISDICTION

The Court has jurisdiction under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2)(G) and (L). Venue is proper in this district under 28 U.S.C. §§ 1408 and 1409.

### II.     FACTUAL AND PROCEDURAL BACKGROUND

Kenneth Grant ("Mr. Grant") is a Norwegian investor who has long been involved with Denver's commercial real estate industry. He and companies with which he has been affiliated have bought, sold, and managed many properties in Denver and surrounding areas over the past several decades. Companies affiliated with Mr. Grant include Debtor; Toma West Management Corp. ("Toma West"), a property management company; and Orchard Falls Operating Company, LLC ("Orchard Falls"), a debtor in case number 25-16047 TBM.

Debtor, a single-asset real estate entity, owns real property and improvements including a high-rise commercial office building located at 700 17th Street, Denver, Colorado 80202 (the "Property"). Debtor purchased the Property in 2016 for $32,000,000. To finance the purchase, Debtor borrowed $21,000,000 (the "Loan"), as set forth in a Loan Agreement and a Promissory Note (the "Note"), secured by a Deed of Trust and Security Agreement on the Property. Lender is the current holder of the Note.

For several years, Toma West managed the Property, and Debtor performed in accordance with the terms of the Loan. In late 2023, with the Maturity Date approaching, Debtor hoped to be able to refinance the Loan, but no such agreement was accomplished.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Case No. 25-16173 KHT

Mr. Grant testified Debtor was unwilling to continue making Loan payments without some agreement in place. Debtor made its last Loan payment in December 2023. In 2024, Lender declared the Loan in default and retained LNR Partners, LLC, as special servicer.

On July 11, 2024, Lender sought appointment of a receiver in Denver District Court, Case No. 2024CV32100. On July 26, 2024, the Denver District Court appointed Transwestern Property Company SW GP, L.L.C. ("Transwestern") as Receiver for the Property. Since that time, Transwestern has been managing the Property, in conjunction with Toma West. Lender also began foreclosure proceedings in the City and County of Denver.[1]

In response to Lender's foreclosure proceedings, Debtor filed its voluntary Chapter 11 petition on September 24, 2025, designating itself as a Single Asset Real Estate Debtor under 11 U.S.C. § 101(51B). By the time Debtor filed its bankruptcy petition, office values in downtown Denver had decreased substantially since 2016, anywhere from 10-25% for some buildings, with some older commercial skyscrapers selling for 90% below 2019 value. The Parties stipulate the current value of the Property is $6,000,000.00. Transwestern continues to operate and manage the Property, which has an occupancy rate between 40 and 45% and generates approximately $172,000 in gross rental income per month. The Property has lost approximately $50,000 each month, which Lender has been covering.

On December 23, exactly 90 days after Debtor's bankruptcy filing, Debtor filed its Chapter 11 Plan of Reorganization (the "First Plan," docket #66). The First Plan placed Lender's secured claim in Class One, to be paid by a $6 million promissory note amortized over 30 years, with a monthly payment of $35,973.03. The First Plan placed Lender's unsecured claim in Class Two and Debtor's other unsecured creditors in Class Three. The First Plan provided for one payment of $300,000 to be divided pro rata to claims in Class Two and to Class Three.[2] The First Plan provided Mr. Grant (through a company) would make a $500,000 contribution on the effective date and make an additional contribution of $3,045,756 over the term of the First Plan.

Lender filed an Objection to the Disclosure Statement accompanying the First Plan, and it also filed its Motion for Relief from the Automatic Stay or, in the alternative, for Dismissal of the Debtor's Bankruptcy Case (the "Stay Relief Motion," docket #89), relying on 11 U.S.C. §§ 362(d) and 1112(b). Debtor filed an objection to the Stay Relief Motion (docket #108). Lender also filed an election under 11 U.S.C. § 1111(b) (docket #92), as a result of which Lender's claim was treated as fully secured. At the hearing on the adequacy of Debtor's Disclosure Statement, the Court required Debtor to file an amended plan and disclosure statement by March 16, 2026 (docket #95). At the preliminary hearing on the Stay Relief Motion, held March 10, the Court set further

---

[1] The parties' Joint Stipulation of Facts states the foreclosure was initiated in Arapahoe County. This appears to be an error, perhaps referring to foreclosure proceedings initiated against Orchard Falls.

[2] Based on the amount of Lender's unsecured claim and the total claims filed in Class Three, Lender (Class Two) was anticipated to received a distribution of approximately 1.6% on its claim. By contrast, Class Three creditors were anticipated to receive a distribution of approximately 27.8% on their claims.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Case No. 25-16173 KHT

deadlines for Lender to file a supplement to its Stay Relief Motion and for Debtor to file a response.

On March 16, Debtor filed its First Amended Plan of Reorganization (the "Amended Plan," docket #120). Under the Amended Plan, Debtor proposed to pay monthly installments of $48,215.49 to Lender over 30 years, with a balloon payment of $5,985,091 at the end of the term. The aggregate amount of the monthly payments (totaling $17,357,576.40), plus the balloon payment of $5,950,745.07, equals $23,308,321.47. The present value of the monthly payments is $6,895,664, and the present value of the balloon payment is $679,700. These amounts together total $7,575,364, which is more than the Property's current fair market value of $6,000,000. The Amended Plan provided Lender would retain its first-priority, perfected, secured Liens until payment of the full amount of its claim.[3] The Amended Plan further provided Mr. Grant (through a company) would make a $500,000 contribution on the effective date and make an additional contribution of $3,045,756 over the term of the Amended Plan.

On April 6, the Court held a hearing on the adequacy of the Disclosure Statement accompanying the Amended Plan. The Court approved the Disclosure Statement and set an evidentiary hearing on confirmation to take place May 18, 2026 (docket ##130, 131).

Lender timely filed a supplement to its Stay Relief Motion (docket #132), and Debtor timely filed its Response (docket #138). At a preliminary hearing held April 28, the Court set the Stay Relief Motion for an evidentiary hearing, to be held in conjunction with the hearing on confirmation (docket #148).

Meanwhile, the Unsecured Creditors' Committee, which had been appointed in October of 2025, retained counsel (docket ##149, 152) and sought a continuance of the confirmation hearing (docket #151). The Court denied the continuance (docket #153) but permitted counsel to appear by Zoom.[4]

Debtor filed its Ballot Voting Report (docket #158), which reflected Class 2, an impaired class of unsecured claims, voted to accept the Amended Plan. Lender voted to reject the Amended Plan. Lender also objected to confirmation of the Amended Plan (docket ##159, 162).

The Court held an evidentiary hearing, at which exhibits were admitted and the Court heard the testimony of Mr. Grant; Leanna Bourke, CFO of Toma West; Andy Devitt, senior project manager with Transwestern; and Melisa Vis, a representative of LNR Partners, LLC (docket #164). Following the hearing, the Court took the matter under advisement.

---

[3] Lender's Proof of Claim, No. 6, asserts a secured claim of $24,342,415.34, but the total amount due is $23,308,319, due to certain credits.

[4] Counsel for the Unsecured Creditors' Committee appeared at the evidentiary hearing and voiced support of the Amended Plan, which provides the only possible chance for unsecured creditors to receive any payment on their claims.

3

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Case No. 25-16173 KHT

## III.     APPLICABLE LAW

The Court first turns to confirmation of Debtor's Amended Plan.  Under 11 U.S.C. § 1129(a)(11),[5] the Court shall confirm a plan "only if… [c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." Here, Lender argues the Amended Plan is not feasible, a requirement the Tenth Circuit Court of Appeals has described as follows:

> The purpose [of the feasibility requirement] is to prevent confirmation of visionary schemes which [promise] creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation… In determining whether [a plan] is feasible, the bankruptcy court has an obligation to scrutinize the plan carefully to determine whether it offers a reasonable prospect of success and is workable.

*In re Pikes Peak Water Co.*, 779 F.2d 1456, 1460 (10th Cir. 1985) (quoting *Pizza of Hawaii, Inc. v. Shakey's, Inc. (In re Pizza of Hawaii, Inc.)*, 761 F.2d 1374, 1382 (9th Cir. 1985) and *Prudential Ins. Co. of America v. Monnier (In re Monnier)*, 755 F.2d 1336, 1341 (8th Cir. 1985)). Though a feasible plan need not guarantee success, it must still offer a reasonable assurance. *In re Saratoga and North Creek Railway*, *LLC*, 635 B.R. 581 (Bankr. D. Colo. 2022). Debtor bears the burden of proof to show it has satisfied the confirmation standards, including feasibility, by a preponderance of the evidence. *In re Lost Cajun Enterprises*, *LLC*, 634 B.R. 1063, 1072 (Bankr. D. Colo. 2021).[6]

After determining whether Debtor's Amended Plan can be confirmed, and especially if the Court cannot confirm the Amended Plan, the Court must consider whether to grant relief from the automatic stay, as follows:

> (d)     On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—
>
> . . . .
>
> > (3)     with respect to a stay of an act against single asset real estate under subsection (a), by a creditor whose claim is secured by an

---

[5] Further references to "section" are to those of the Bankruptcy Code, 11 U.S.C., unless otherwise indicated.

[6] Feasibility is the only challenge pending before the Court. At the evidentiary hearing, Lender announced its decision not to proceed on the issue of good faith. If the Court were to consider the issue of good faith, the Court would not find Debtor had met its burden. The Bankruptcy Code requires a SARE Debtor to file a confirmable plan within 90 days of its petition date. Here, Debtor's First Plan, filed on the 90th day, was patently unconfirmable, for the reasons stated in Lender's objection (docket #87), particularly the 30-year term. Debtor has argued the 30-year term in its Amended Plan was required by Lender's § 1111(b) election, but its First Plan contained the same term and did not otherwise anticipate the filing of the election.

interest in such real estate, unless, not later than the date that is 90 days after the entry of the order for relief (or such later date as the court may determine for cause by order entered within that 90-day period) or 30 days after the court determines that the debtor is subject to this paragraph, whichever is later—

(A)      the debtor has filed a plan of reorganization that has a reasonable possibility of being confirmed within a reasonable time; or

(B)      the debtor has commenced monthly payments that—

(i) may, in the debtor's sole discretion, notwithstanding section 363(c)(2), be made from rents or other income generated before, on, or after the date of the commencement of the case by or from the property to each creditor whose claim is secured by such real estate (other than a claim secured by a judgment lien or by an unmatured statutory lien); and

(ii) are in an amount equal to interest at the then applicable nondefault contract rate of interest on the value of the creditor's interest in the real estate…

§ 362(d)(3). Here, Debtor has not made the monthly payments required by § 362(d)(3)(B). The Court thus looks to § 362(d)(3)(A). As the party opposing relief from stay, Debtor bears the burden of proving a reasonable possibility of confirming a plan within a reasonable time. *In re Aspen Club & Spa, LLC*, No. BAP CO-19-043, 2020 WL 4251761, at *6 (10th Cir. BAP July 24, 2020).

## IV.     DISCUSSION

The Court will first discuss whether the Amended Plan satisfies the feasibility requirement of § 1129(a)(11) and can be confirmed. Next, and especially if the Amended Plan cannot be confirmed, the Court will discuss whether to grant the Stay Relief Motion.

### A.     Plan Confirmation.

As an initial matter, Lender urges the Court to hold the Amended Plan infeasible as a matter of law, given the length of the proposed term. The Court cannot so hold. Thirty-year plan terms are not unconfirmable *per se*. *In re Trenton Ridge Investors, LLC*, 461 B.R 440, 491 (Bankr. S.D. Ohio 2011) (citing *In re Mayslake Village-Plainfield Campus, Inc.*, 441 B.R. 309 (Bankr. N.D. Ill. 2010)). But, "proof of feasibility is an easier task when the payout is done over a shorter period of time" and [w]hile deferred payment plans are not considered infeasible *per se*, such plans are subject to close scrutiny. . . ." *Id.*

5

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Case No. 25-16173 KHT

When determining whether a plan is feasible, courts often consider a debtor's cash flow projections showing its ability to simultaneously make plan payments and fund projected operations. The projections must be based upon evidence of financial progress and must not be speculative, conjectural, or unrealistic. While courts often do not require projections for the same period over which a long-term plan spans, a debtor must still sustain its burden to somehow prove that it will be able to perform all obligations it is assuming under the plan. This is especially true when significant balloon payments are required in years not covered by the projections.

*In re Inv. Co. of the Southwest, Inc.,* 341 B.R. 298, 311 (10th Cir. BAP 2006).

Debtor submitted projections to this Court and its creditors in March 2026, included in its Amended Disclosure Statement (the "March Projections," in Exhibit 2). The March Projections included the following totals:

| | FYE 2026 | FYE 2027 | FYE 2028 | FYE 2029 | FYE 2030 |
|---|---|---|---|---|---|
| Revenue | 2,059,358 | 2,079,653 | 2,162,571 | 2,086,203 | 2,207,400 |
| Operating Expenses | 2,259,956 | 2,267,455 | 2,312,804 | 2,359,060 | 2,406,241 |
| Net Operating Income (Loss) | (200,598) | (187,803) | (150,233) | (272,858) | (198,841) |
| Non-Operating Costs | 3,505,029 | 3,179,471 | 3,193,771 | 2,958,055 | 2,988,345 |
| Net Cash[7] Surplus (Deficit) | (1,445,671) | (1,099,818) | (1,031,200) | (871,852) | (780,944) |
| Owner Contribution | 1,100,000 | 1,100,000 | 1,000,000 | 900,000 | 750,000 |
| Ending Cash | 68,512 | 68,694 | 37,494 | 65,642 | 34,697 |

Under the March Projections, Debtor would incur a substantial operating loss every year, from a loss of $1,445,671 in 2026 to a loss of $780,944 in 2030. The March Projections call for Mr. Grant (through a company) to invest a total of $4,850,000 between 2026 and 2030. The March Projections do not include information for any years after 2030. Presumably, losses would be expected to continue, and additional owner contributions would be required.

At the evidentiary hearing held May 18, Debtor submitted revised projections (the "May Projections," Exhibit 5). The May Projections included the following totals:

---

[7] Includes a beginning cash balance of 414,183.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Case No. 25-16173 KHT

|  | FYE 2026 | FYE 2027 | FYE 2028 | FYE 2029 | FYE 2030 |
|---|---|---|---|---|---|
| Revenue | 2,157,799 | 2,118,692 | 2,473,288 | 2,770,351 | 3,280,364 |
| Operating Expenses | 2,259,956 | 2,267,455 | 2,312,804 | 2,359,060 | 2,406,241 |
| Net Operating Income (Loss) | (102,157) | (148,763) | 160,484 | 411,290 | 874,122 |
| Non-Operating Costs | 1,245,073 | 1,060,800 | 880,967 | 896,562 | 879,671 |
| Net Cash[8] Surplus (Deficit) | (1,347,230) | (1,209,563) | (720,483) | (485,272) | (5,549) |
| Owner Contribution | 1,100,000 | 1,200,000 | 700,000 | 500,000 | 0 |
| Ending Cash | 166,953 | 157,390 | 136,907 | 151,635 | 146,086 |

Under the May Projections, Debtor would stop losing money in 2030, with a positive net operating income of $901,753 in 2031, up to a positive net operating income of $2,308,670 in 2035. The May Projections call for Mr. Grant (through a company) to invest a total of $3,500,000 between 2026 and 2029, after which owner contributions would not be needed to cover losses.

Ms. Bourke, CFO of Toma West, testified she created both the March Projections and the May Projections, based on assumptions provided to her by Mr. Grant and Richard Herold, General Manager of Toma West. When asked to explain the change in projected income between that reflected in the March Projections and that reflected in the May Projections, she pointed to a nearby office building that was changing from office space to residential space, which would likely cause an increased demand for office space in neighboring buildings. While the Court found Ms. Bourke to be a credible witness, the Court cannot find that justification to be credible. The current demand for commercial office space is low, and the Court cannot find it is likely to increase soon. The aggressive occupancy increases reflected in the May Projections – 64% in 2031, 71% in 2032, 77% in 2033, 84% in 2034, and 90% in 2035 – are not realistic, and Debtor's projected income is not credible.

Not only are Debtor's income projections unrealistic, but also its expense projections are unrealistic. Debtor does not include any amounts for tenant improvements for existing tenants, all of whom are expected to renew at increasing rates. That is unlikely. More importantly, Debtor does not include any amounts for capital repair expense or capital improvements. The office building on the Property is 66 years old. As Mr. Devitt testified credibly, the Property has already needed substantial repairs and maintenance, and its repair and maintenance needs will likely increase over time. When Transwestern began operating the Property, it had to repair two of the four passenger elevators that had been inoperable for quite some time, and it evaluated and repaired the HVAC system. Those costs were covered by Lender. Mr. Devitt also testified the Property's switchgear, which regulates and directs power throughout the Property, had

---

[8] Includes a beginning cash balance of 414,183.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Case No. 25-16173 KHT

been damaged in a flood and had not been replaced. Although a temporary fix had been put in place, Mr. Devitt testified the fix was not a long-term solution, and without a switchgear replacement, the Property was subject to being "red tagged" (shut down by the fire department). Transwestern successfully amended Debtor's insurance claim to include replacement of the switchgear. Those are just a few examples over the past two years. Buildings in general, and older buildings in particular, need repairs and maintenance. The idea Debtor could attract and retain increasing numbers of office tenants without spending substantial amounts on maintenance, repairs, or improvements, is not realistic.

Finally, the Court considers the owner contributions required in Debtor's projections. The March Projections called for Mr. Grant (through a company) to contribute a total of $4,850,000 between 2026 and 2030, with additional contributions likely to be needed after 2030. The evidence before the Court did not show Mr. Grant or his companies could make those contributions. Mr. Grant currently holds funds in Norwegian bank accounts with a total balance of 31,383,862 NOK (Norwegian Krone), which is the equivalent of approximately $3,281,747.00, well short of the $4,850,000 needed to cover the losses set forth in the March Projections. The contributions required in the May Projections are lower, $3,500,000, but that number is still higher than the balance of funds in Mr. Grant's accounts, funds which Mr. Grant has committed to both Debtor and Orchard Falls.[9] Even if Mr. Grant and his companies were able to obtain additional funds, the Amended Plan does not obligate him to make the contributions. Mr. Grant admitted he did not know whether he would make the contributions if the Debtor's occupancy rates further declined, which would be consistent with his unwillingness to contribute sufficient funds for Debtor to make its Loan payments after December 2023, over two years prior to the Loan Maturity Date.

Considering all the evidence before the Court, the Court cannot find Debtor has shown the Amended Plan offers a reasonable prospect of success or is workable through 2030, much less throughout the 30-year plan term. To show feasibility over that extraordinary amount of time, "a debtor must not only convince the court that it can make the necessary changes to fulfill its obligations under the plan, but it also faces the difficult burden of showing that macroeconomic factors or other economic changes outside of the debtor's control are not likely" to affect the repayment of creditors. *In re Avondale Gateway Ctr. Entitlement, L.L.C.*, No. 09-BK-12153-CGC, 2011 WL 6936526 at *10 (Bankr. D. Ariz. Dec. 27, 2011). Debtor has not met its burden. Debtor's best-case scenario requires active and extended participation from Mr. Grant, who admitted he will "not be here" for the full 30-year plan term. He testified his son may step in, and he may bring in a partner, but he did not identify which son, nor did he identify any potential partner. Without a showing Debtor will continue to be managed by experienced, committed businesspersons, the Court cannot find Debtor is likely to perform its obligations over the term of the Amended Plan.

---

[9] The Disclosure Statement filed in the Orchard Falls case is attached to Lender's Supplement, docket #132 as Exhibit A. Mr. Grant admitted the funds pledged in both cases are the same funds.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Case No. 25-16173 KHT

Mr. Grant has substantial experience in Denver's commercial real estate market and has seen many ups and downs over the past few decades. He has invested a great deal of his own money into Debtor and other commercial real estate projects and appears motivated to see the projects succeed and to retain a presence in the market. His optimism that the market will improve quickly and significantly enough for the Property to achieve close to full occupancy by 2035, allowing him to refinance the Loan, may be admirable in many respects. But, the Debtor's situation requires more than optimism or even sheer force of will. This Court must make a feasibility determination based on objective evidence. Here, the objective evidence does not support a conclusion confirmation of the Amended Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor. Confirmation will, therefore, be denied.

## B.     Relief from Stay.

For a Single Asset Real Estate Debtor, the automatic stay terminates ninety days after the petition date or the date the Court determines the debtor is a single asset debtor unless one of the statutory conditions is met. *In re RIM Dev, LLC*, 448 B.R. 280, 288 (Bankr. D. Kan. 2010). Because Debtor did not make the monthly payments required by § 362(d)(3)(B), it was required to show it had filed a plan of reorganization that had a reasonable possibility of being confirmed within a reasonable time. Debtor did not meet that burden. Its First Plan was patently unconfirmable, and its Amended Plan is not confirmable. Thus, "stay relief is mandatory." *Id.* The Court will grant the Stay Relief Motion.

## V.     CONCLUSION

For the reasons discussed above, the Court finds Debtor has not met its burden of satisfying each requirement of § 1129(a). Specifically, Debtor has not satisfied § 1129(a)(11). Debtor's Amended Plan cannot be confirmed. And, because Debtor did not satisfy the requirements of § 362(d)(3), relief from stay is appropriately granted.

A separate judgment shall enter.

IT IS SO ORDERED.

Dated: May 27, 2026                              BY THE COURT:

Kimberley H. Tyson
United States Bankruptcy Judge

9